UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JARROD JAY BATTERSHELL,                   Case No. 18-12261-t13

    Debtor.

## OPINION

Before the Court is Debtor's objection to his mortgage lender's proof of claim. The lender had a home equity line of credit mortgage on Debtor's house, behind a large first mortgage. After both mortgages went into default and foreclosure, the lender paid off the first mortgage as a protective advance. Debtor argues that the transaction should be recharacterized as a loan purchase rather than a payoff, so Debtor can cure the arrearages on both loans in this chapter 13 and try to save his house. The lender counters that such a recharacterization would violate § 1322(b)(2).[1] The Court, having held a final hearing on the claim objection, concludes that there is no legal basis for recharacterizing the transaction as Debtor proposes, and that doing so would violate § 1322(b)(2). The claim objection therefore will be overruled.

### I.     FACTS

The Court finds:[2]

On August 18, 2015, Debtor borrowed money from the Sandia Area Federal Credit Union, evidenced by a home equity credit agreement ($200,000 credit limit) and secured by a mortgage on Debtor's house at 580 Los Arboles Verde, Corrales, NM 87048.

---

[1] Unless otherwise indicated, all statutory citations are to 11 U.S.C.
[2] The Court took judicial notice of the docket in the bankruptcy case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

On April 20, 2106, Debtor borrowed $517,880 from PennyMac Loan Services LLC, also secured by a mortgage on his house. The credit union subordinated its home equity line of credit mortgage to PennyMac's mortgage.

Paragraph 7 of the credit union's mortgage provides:

> Protection of Lender's Security. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make and take such action as is necessary to protect Lender's interest. Any amounts disbursed by Lender pursuant to this paragraph 7, with finance charges thereon, at the rate provided in the Credit Agreement, shall become additional indebtedness of Borrower secured by this Security Instrument. Unless Borrower and lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof…

Paragraph 7 of the credit union's credit agreement provides:

> CREDIT LIMIT. You promise not to request or obtain an advance that will make your balance exceed your credit limit. Your credit limit will not be increased if you exceed your credit limit. If you exceed your credit limit, you agree to repay the excess immediately.

Debtor defaulted on the credit union loan. On May 23, 2017, the credit union filed a foreclosure action against Debtor and PennyMac. PennyMac answered the complaint and brought a cross-claim to foreclose its first mortgage. Debtor defended the action *pro se*.

On October 16, 2017, the credit union paid off the PennyMac loan (the payoff amount was $520,608.33). PennyMac recorded a release of mortgage in the Sandoval County, New Mexico records on November 6, 2017.[3]

On November 11, 2017, the state court entered a stipulated order dismissing PennyMac

---

[3] The release was required by law. *See* N.M.S.A. § 48-7-4 (Release on record upon satisfaction of mortgage). Failure to release a paid mortgage can result in the imposition of a small fine and the payment of the owner's attorney fees. *See* N.M.S.A. § 48-7-5.

and allowing the credit union to file a supplemental claim against Debtor.

The state court entered a final foreclosure judgment on July 31, 2018. The judgment provides in part:

> WHEREFORE IT IS ORDERED, ADJUDGE [sic] AND DECREED that Plaintiff is awarded Judgment as against the Defendant Jarrod Battershell as follows:
>
>    A. Damages in the amount of $206,717.15 as of April 12, 2018, plus interest at the rate of 6.0% per annum.
>
>    B. Damages in the amount of $520,608.33, as of October 16, 2017, plus interest at the rate of 6.0% per annum.
>
> . . .
>
>    C. [sic] Plaintiff's Mortgage is hereby declared to be the first lien against the subject real property and the Mortgage is foreclosed.

The judgment ordered the house sold by a special master and the sales proceeds applied to the judgment amount. The special master noticed the sale for September 12, 2018.

Debtor filed this chapter 13 case on September 6, 2018, followed by a plan that proposed to treat the credit union debt as two secured claims:

| Creditor | Estimated claim amount | Collateral | Collateral value | Treatment | Interest rate | Estimated arrearage | Adequate protection (yes/no) | Equal monthly payments (yes/no) |
|---|---|---|---|---|---|---|---|---|
| Sandia Area Federal CU | $534,663 | 580 Los Arboles Verde, Corrales, NM | $750,000 | Direct | 3.2% | $51,300 | No | No |
| | | First Mortgage | | | | | | |
| Sandia Area Federal CU | $201,000 | 580 Los Arboles Verde, Corrales, NM | $750,000 | Direct | 5.75% | $30,600 | No | No |

The credit union timely objected to the plan. It also filed a proof of claim for $779,665.38, of which $546,169.35 was a pre-petition arrearage. Attached to the proof of claim are copies of the judgment, credit agreement, and mortgage.

On November 26, 2018, Debtor objected to the credit union's proof of claim, arguing:

> Debtor maintains that the pre-petition arrearage on the First Mortgage is $51,300.00 Debtor maintains that the pre-petition arrearage on the Second Mortgage is $30,600.00. Debtor proposes to pay the pre-petition arrearages on both mortgages directly to Creditor once he is informed [sic] the amount of each payment.
> Debtor request that the court enter an order specifying that: (a) Creditor has a pre-petition arrearage claim based on the First Mortgage in the amount of $51,300.00; (b) Creditor has a pre-petition arrearage claim based on the Second Mortgage in the amount of $30,000.00; and (c) require that Creditor specify the post-petition monthly amounts due on the First Mortgage and the Second Mortgage.

The credit union responded that granting the requested relief:

> would improperly modify the Credit Union's rights pursuant to 11 U.S.C. § 1322(b)(2), which does not allow modification of rights in a claim secured only by a security interest in real property that is the debtor's principal residence. . . . Essentially, debtor is asking the Court to reinstate the terms of the Pennymac mortgage, which was satisfied in 2017, and then to assign that mortgage to the Credit Union and force the Credit Union to be bound by its terms. Credit Union fails to see how forcing an assignment of a mortgage (now satisfied) is not an impermissible modification of its rights pursuant to 11 U.S.C. § 1322(b)(5).

## II.  DISCUSSION

A.  <u>Loan Payoff Versus Loan Purchase</u>.

Junior lienholders faced with foreclosing first mortgagees are in a difficult position. In a typical foreclosure action, the only bidder at the foreclosure sale is the first mortgagee, which typically credit bids all or a portion of its judgment. That leaves nothing for junior liens. To protect themselves if they believe there is value in the encumbered property beyond the first mortgage, junior lienholders can buy the senior debt or pay it off. It is not that common for junior lienholders to do either, but it does happen. Apart from the bankruptcy issues discussed below, a debtor is indifferent to whether a junior lienholder pays off the first or buys the first's loan. Either way, the amount the debtor owes is the same.

The difference becomes important, however, if the debtor wants to use chapter 13 to cure

-4-
Case 18-12261-t13    Doc 66    Filed 05/14/19    Entered 05/14/19 11:23:37 Page 4 of 11

his mortgage defaults. In such an event, the cure is easier if the junior lienholder buys the first mortgage. Here, for example, had the credit union bought the PennyMac loan, Debtor could have tried to "cure" both mortgages by paying $81,900 in arrearages over five years and making the regular mortgage payments "outside the plan." Upon completion of these payments, Debtor would have had two current mortgages with all pre-petition defaults cured.

Because the credit union paid off the PennyMac loan rather than buying it, however, curing the resulting single loan became much more difficult. With the large protective advance, the pre-petition arrearage mushroomed from $81,900 to $546,169. Monthly plan payments of at least $9,102.82 would be required to pay the arrearage over five years.

B.  The Credit Union was Within its Rights to Pay off PennyMac.

The credit union's protective advance did not violate the loan documents or applicable law. The mortgage provides that

> if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice of Borrower, may make . . . . disburse such sums . . . and take such action as is necessary to protect Lender's interest.

Given PennyMac's suit to foreclose its first mortgage, the credit union made a legitimate, if unusually large, protective advance.

C.  Section 1322(b)(2) Prohibits the Requested Recharacterization.

§ 1322(b)(2) provides:

(b) Subject to subsections (a) and (c) of this section, the plan may—

. . .

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims . . . .

There is no dispute that the house is Debtor's principal residence. *See* § 101(13A).

> As the Supreme Court stated in *Nobelman v. American Savings Bank*, 508 U.S. 324 (1993):
>
> The bank's "rights" . . . are reflected in the relevant mortgage instruments, which are enforceable under Texas law. They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure. . . . These are the rights that were "bargained for by the mortgagor and the mortgagee," *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S. Ct. 773, 778, 116 L. Ed. 2d 903 (1992), and are rights protected from modification by § 1322(b)(2).

508 U.S. at 329-30.

One of the credit union's rights was to make protective advances if necessary. Recharacterizing the PennyMac loan payoff as a loan purchase would take away that right, in violation of § 1322(b)(2).

More generally, recharacterizing the PennyMac loan payoff as a loan purchase would completely change the credit union's secured claim. The modifications are summarized in the following table:

| Loan term | Current | Recharacterized |
|---|---|---|
| Balance | $779,665.38 | $779,665.38 (divided into two loans) |
| Number of loans | One | Two |
| Interest rate | 6% | 4.5% and 6%[4] |
| Maturity date | 8/15/2030 | 8/15/2030 and unknown |
| Arrearage | $546,169 | $81,900 |
| Monthly payment | $1,830 | $4,130 |
| Governing documents | Credit union agreement and mortgage | Credit union agreement and mortgage, plus the PennyMac note and mortgage |

In short, the proposed recharacterization would modify everything except the loan

---

[4] The Court does not have enough evidence to know what the interest rates would be on the "recharacterized" loans, only that the rates differ.

balance(s).

D. <u>Recharacterization Presents Substantial Practical Difficulties</u>.

Debtor's request that the Court "specify" that the credit union holds two mortgage loans, not one, is fraught with practical difficulties. To change the PennyMac payoff transaction to a loan purchase, the Court would have to:

- Order PennyMac to sign and record a "reinstatement of mortgage," rescinding its earlier release of mortgage;
- Order PennyMac to assign its paid off note and mortgage to the credit union, deliver the original promissory note to the credit union, and void any language such as "paid in full" that had been affixed to the note;[5]
- Order PennyMac to record an assignment of the mortgage in the Sandoval county real estate records;
- Order PennyMac to provide the loan file, payment records, and related documents and information to the credit union; and
- Order the credit union to reallocate the payoff amount to the resurrected note and mortgage.

The Court has no evidence about the tax or regulatory effects on PennyMac or the credit union of such a recharacterization. There may be none, but at a minimum it seems likely the banking regulators would view the transactions differently.

Furthermore, loan purchases typically are accomplished using contracts containing covenants, representations, and warranties. With the proposed recharacterization, the credit union would have to buy PennyMac's loan "as is, where is."

Finally, what would happen if Debtor defaulted under a confirmed plan? Could the credit union proceed to a special master's sale under the foreclosure judgment, or would it have to start over, given the Court's recharacterization order? Would a recharacterization order survive

---

[5] If PennyMac still has the original note. It seems likely that PennyMac delivered the note, marked "paid in full" to Debtor, or else destroyed it. It also seems unlikely that PennyMac retained the original mortgage.

conversion or dismissal?[6]

E.    <u>There is No Legal Basis for Recharacterizing the PennyMac Payoff as a Loan Purchase</u>.

Debtor did not cite to any provision of the Bankruptcy Code or other law that grants this Court the authority to recharacterize the PennyMac payoff transaction. To the extent Debtor relies on the general equitable power of the Court as set out in § 105(a),[7] the reliance is misplaced. Using § 105(a) to disregard § 1322(b)(2) is impermissible. *See, e.g., Law v. Siegel*, 571 U.S. 415, 421 (2014) ("In exercising [its] statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions").

The subsection that appears most promising to Debtor's recharacterization request is § 1322(c)(1), which provides:

> Notwithstanding subsection (b)(2) and applicable nonbankruptcy law-
>  (1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law . . .

Under this subsection, a chapter 13 debtor may reinstate a mortgage and cure pre-petition defaults even after entry of a foreclosure judgment. *See Jim Walter Homes, Inc. v. Spears (In re Thompson)*, 894 F.2d 1227, 1231 (10th Cir. 1990) (if a debtor files a chapter 13 petition before a foreclosure sale, he has a right to cure); *In re Jackson*, 452 B.R. 818, 823 (Bankr. D. Kan. 2011) (a debtor may cure and reinstate a home mortgage until the property is sold in a foreclosure sale). The cure can include "de-accelerating" the payments due on the defaulted note. 8 Collier on Bankruptcy ¶1322.09[6] (16th ed.), citing *Di Pierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 26-27

---

[6] Perhaps Debtor is only asking the Court to impose a legal fiction that the PennyMac loan was bought rather than paid off. Such a request would avoid the practical problems just discussed. However, as set out in the next section, the Court lacks the power to create that parallel universe.
[7] "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

-8-
Case 18-12261-t13    Doc 66    Filed 05/14/19    Entered 05/14/19 11:23:37 Page 8 of 11

(2d Cir. 1982) (the power to cure must comprehend the power to "de-accelerate.").

However, § 1322(c) only applies to claims secured by liens on the debtor's personal residence. *See* § 1322(c)(1) and (2). When Debtor filed this case, the PennyMac lien had been released for more than ten months. A debtor's right to cure defaults under § 1322(c) does not include the power to reinstate loans that were paid off pre-petition.

Further, the cure rights granted under § 1132(c) are subject to the anti-modification provisions of § 1322(b)(2). Section 1322(c) does not give Debtor *carte blanche* to rewrite the credit union's loan or recharacterize the PennyMac payoff.

F.   Recharacterizing the PennyMac Payoff Would Overturn the State Court Judgment.

As its foreclosure judgment shows, the state court approved of the credit union paying off PennyMac and treating the payment as a protective advance, secured by the credit union's mortgage. Recharacterizing the credit union's claim as Debtor suggests would conflict with, ignore, and/or overturn the state court judgment. That would be improper. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (discussing the *Rooker-Feldman* doctrine, which prohibits lower federal trial courts from acting as courts of appeal from final state court judgments). If Debtor wanted to challenge the credit union's right to pay off PennyMac instead of buying its loan, he should have done so in state court.

G.   Debtor Could Have Protected Himself.

By the time Debtor filed this bankruptcy case, it was too late for him to take advantage of § 1322(c) to cure both mortgage arrearages. Debtor could have filed much sooner, however. His home equity loan apparently went into default in March or April 2017. While the credit union brought the foreclosure action in May 2017, it did not pay off PennyMac until October 2017. Debtor had six months to file a chapter 13 case between the initial default and the PennyMac loan

payoff. Instead of acting promptly, when he could have benefited from § 1322(c), Debtor waited until it was almost eleven months too late. Sometimes, debtors can use delay to their advantage. Other times, delay is an enemy. This appears to be an example of the latter.

H.  Debtor Does Not Have Enough Income to Save the House.

Debtor discloses on his bankruptcy schedules $3,617 in net monthly income and $1,290 in expenses other than mortgage payments. That leaves Debtor $2,327 a month to cure his mortgage defaults and make regular mortgage payments. If the Court were to recharacterize the PennyMac payoff transaction as a loan purchase, Debtor would still have to pay combined pre-petition arrearages of $81,900 (or $1,365 a month over 60 months),[8] together with regular monthly payments on both mortgages of $4,130.[9] Together, the arrearage and regular mortgage payments total $5,495, leaving a monthly shortfall of $3,168. Thus, Debtor's monthly income is only about half want he would need to "save the house" if the Court recharacterized the PennyMac loan payoff.

### III.  CONCLUSION

In October 2017, after PennyMac sued to foreclose its first mortgage on Debtor's house, the credit union took the unusual but entirely lawful step of paying PennyMac's loan in full. While the credit union's protective advance greatly increased its pre-petition arrearage, the Court has no ability to recharacterize the loan payoff as a loan purchase. Furthermore, doing so would violate § 1322(b)(2) and contradict the state court foreclosure judgment. Debtor's claim objection therefore must be overruled. A separate order allowing the credit union proof of claim will be entered.

---

[8] From Debtor's plan. This figure does not take into account counsel fees or trustee fees.
[9] From Schedule J.

_____

Hon. David T. Thuma
United States Bankruptcy Judge

Entered: May 14, 2019

Copies to: electronic notice recipients